# United States Tax Court

T.C. Memo. 2022-98

BELMONT INTERESTS INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 25660-17.                    Filed September 26, 2022.

————————

R determined deficiencies for the taxable years 2012 and 2013 in the federal income tax of the consolidated group of which P is the common parent. The deficiencies relate to indebtedness (Deficiency Notes) issued by seven members of the group (Loss Subsidiaries). The Deficiency Notes required annual installment payments starting in 1993 and matured in full on May 1, 2007. In the returns it filed for years before 2012, P took into account the cancellation of prior installment payments but did not report the Deficiency Notes' full cancellation. P now contends that the Deficiency Notes were canceled in full no later than 2011. R seeks to apply the duty of consistency to treat the Deficiency Notes as having been canceled in 2013. On the premise that the Loss Subsidiaries were entitled to deduct accrued interest on the Deficiency Notes through 2013, R contends that those subsidiaries cannot be treated, for the purpose of Treasury Regulation § 1.1502-19(c)(1)(iii)(A), as having disposed of all of their assets until 2013. R further contends that the members of P's group that owned stock in the Loss Subsidiaries had excess loss accounts (ELAs) in that stock that they were required to include in their 2013 income by reason of the asset disposition rule. Alternatively, R seeks to apply the duty of consistency to treat the Loss Subsidiaries as having disposed of all of their assets in 2012, requiring the

**Served 09/26/22**

**[*2]**    inclusion in income for that year of ELAs in the Loss Subsidiaries' stock.  P moved for summary judgment, arguing that the duty of consistency does not apply because any errors in its prior reporting of ELAs were attributable to mutual mistakes of law.

*Held*:  When a subsidiary member of a consolidated group (*S*) disposes of all of its assets, a member that owns *S* stock (*M*) must include in income for the year of disposition any ELA in *M*'s stock in *S* regardless of whether *S* may be entitled to deductions for one or more subsequent years.  Treas. Reg. § 1.1502-19(c)(1)(iii)(A).

*Held, further*, because the time when debt will be discharged for federal income tax purposes cannot be predicted in advance, R's professed reliance on P's representations that each payment required under the terms of the Deficiency Notes would be canceled six years after its due date demonstrates that the failure of P's group to take into account the full cancellation of the Deficiency Notes before 2012 reflected a mutual mistake of law. Consequently, the duty of consistency does not bind P to representations that, if accepted as true, would mean that the Deficiency Notes were canceled after December 31, 2011. P's Motion for Summary Judgment will thus be granted in part.

*Held, further*, because P has not established that its failure to have reported income from the recognition of ELAs when the Loss Subsidiaries disposed of all their assets and R's acquiescence to that reporting were attributable to a mutual mistake of law, P's Motion for Summary Judgment will also be denied in part.

————

*G. Tomas Rhodus*, *David C. Gair*, and *Joshua D. Smeltzer*, for petitioner.

*Kirk S. Chaberski, Candace M. Williams, Sergio Garcia-Pages, Julie P. Gasper, Veronica L. Richards*, and *William D. White*, for respondent.

[*3]                          MEMORANDUM OPINION

HALPERN, *Judge*: In September 2017, respondent notified petitioner of his determination of deficiencies in the federal income tax of the consolidated group of which it is the common parent for the taxable years ended December 31, 2012 and 2013.  The notice of deficiency described respondent's principal adjustment for 2012 as having been based on the tax benefit rule.  That adjustment would have included in the group's income for 2012 interest deductions reported in prior years.  Respondent's principal adjustment for 2013 relied on the duty of consistency to require the group to recognize income from the cancellation of indebtedness.  Petitioner filed its Petition in December 2017, and respondent answered the following February.

Respondent has since amended his Answer repeatedly.  In December 2019, he amended his original Answer to increase his adjustment to the group's income for 2013, relying on provisions of the consolidated return regulations, Treas. Reg. §§ 1.1502-32, 1.1502-19,[1] and the duty of consistency.  In June 2021, respondent filed a First Amended Answer, purportedly based on the "new information" that petitioner had erred in excluding from the consolidated returns it had filed for the years in issue seven indirect, wholly owned subsidiaries (Loss Subsidiaries).  In his First Amended Answer, respondent conceded that no deficiency existed for 2012 but asserted a 2013 deficiency of $93,867,580—an amount exceeding the 2013 deficiency stated in the notice of deficiency.  In support for his principal adjustment for 2013, respondent cited in his First Amended Answer the same authorities he had cited in his amendment to his original Answer: Treasury Regulation §§ 1.1502-32 and 1.1502-19 and the duty of consistency.  In August 2021, petitioner filed a Motion for Summary Judgment, which we denied in an Order issued February 2, 2022 (February 2 order).  Shortly thereafter, respondent advised the Court in a telephone conference of his intent to amend his Answer again in light of the analysis set forth in the February 2 order.

In March 2022, respondent filed a Second Amended Answer.  Respondent's Second Amended Answer reasserts a deficiency for 2013 of $93,867,580, which respondent explains as "based on holding

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, and all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), at all relevant times.

[*4] petitioner to its reported position concerning cancellation of indebtedness income" regarding indebtedness owed by the Loss Subsidiaries (Deficiency Notes) "and applying the duty of consistency to bind petitioner to . . . representations that May 1, 2013, was the point in time when the Deficiency Notes were discharged, and the Seven Loss Subsidiaries became worthless." In the alternative, respondent asserts a deficiency of $93,565,736 for 2012, which he describes as "based on applying the duty of consistency to bind petitioner to its representations that the Seven Loss Subsidiaries were not worthless at any time on or before December 31, 2011."

In April 2022, petitioner filed another Motion for Summary Judgment.[2] Among other things, petitioner's latest Motion requests a ruling that "[t]he duty of consistency is not applicable to create any deficiencies for the years 2012 or 2013." For the reasons explained below, we will grant petitioner's Motion in part and deny it in part. In particular, we conclude that the duty of consistency cannot be applied to bind petitioner to representations that, if accepted as true, would mean that the Deficiency Notes were canceled after December 31, 2011.

*Background*

*The Loss Subsidiaries and the Deficiency Notes*

The issues at hand involve the tax consequences of borrowings by the seven members of petitioner's group that we refer to as the Loss Subsidiaries. Those seven members are Edgemont Holdings, Inc. (Edgemont Holdings), OVPI, Inc. (OVPI), Drexel Properties, Inc. (Drexel Properties), PRG, Inc. (PRG), Ramfield Equities, Inc., Thornhill Capital, Inc. (Thornhill Capital), Warwick Investments, Inc., and Wembley Investments, Inc. Edgemont Holdings is a first-tier subsidiary of petitioner, the group's common parent. Edgemont Holdings owns all of the stock of OVPI, a second-tier subsidiary of petitioner. OVPI owns all of the stock of each of the other six Loss Subsidiaries.

The Loss Subsidiaries issued the indebtedness referred to as the Deficiency Notes to cover unpaid deficiencies in prior debt on which they had defaulted. The 13 Deficiency Notes had an aggregate face amount of $387,952,126. The terms of the Deficiency Notes required annual

---

[2] The Motion for Summary Judgment currently before us is the sixth petitioner has filed in the case. We have denied two of petitioner's prior Motions. Petitioner withdrew its other Motions in response to respondent's various amendments to his Answer.

[*5] payments, due on May 1st of each year from 1993 to 2007.  Each note matured on May 1, 2007.  Each Deficiency Note states that it

> has been executed and delivered in, and shall be governed by and construed in accordance with the laws of the State of Texas, and the substantive laws of such state and the applicable federal laws of the United States of America shall govern the validity, construction, enforcement and interpretation hereof.

*Tax Reporting for Prior Years*

The returns petitioner filed on behalf of its consolidated group for the years 1992 through 2011 claimed deductions of accrued interest on the Deficiency Notes that totaled $469,067,157.  The Loss Subsidiaries uniformly reported losses for each taxable year from 1995 through 2013.[3]  From 1992 through December 31, 2012, however, the Loss Subsidiaries made no payments of interest or principal on the Deficiency Notes.

On the 2011 return filed on behalf of its consolidated group, petitioner reported $28,412,210 of income from the discharge of an installment payment on the Deficiency Notes but did not otherwise report income from the cancellation of the outstanding balances due under the Deficiency Notes.  The balance sheets included in the 2011 return list OVPI's only asset as "Investments in Subsidiaries" and show each of the other Loss Subsidiaries as having total assets of zero.

*Prior Examinations*

The 2004, 2005, and 2006 taxable years of petitioner's group were the subject of previous litigation before the Court.  Respondent also selected for examination the returns petitioner's group filed for the taxable years 2007, 2008, and 2009.  That examination resulted in the issuance of a notice of deficiency for 2007 that led to further litigation before the Court.

In March 2011, in response to an information document request made during the examination of the 2007–09 returns of petitioner's

---

[3] Most Loss Subsidiaries also reported losses for the years 1989 through 1994, although Drexel Properties and OVPI reported taxable income for 1994, PRG reported taxable income for the years 1990 through 1993, and Thornhill Capital reported taxable income for 1993.

**[\*6]** group, respondent received a document captioned "Summary of Interest Adjustment and Forgiveness of Debt." The document is a single page, most of which is taken up by a table that shows, for years from 1992 through 2008, the amounts of interest deducted on petitioner's original returns, corrected interest deductions, forgiveness of indebtedness income, and net adjustments to taxable income. Three statements appear above the table. The first relates to the computation of interest: "As deducted on returns as originally filed, interest was computed on a straight line basis." The second refers to a recomputation of interest "on an installment loan basis as if payments were made." The third refers to income from the cancellation of indebtedness. It reads: "Installments [sic] payments not made are considered COD income after six years."

Respondent did not select for examination the returns petitioner filed for its group for 2010 and 2011.

*Tax Reporting for the Years in Issue*

Petitioner did not include the Loss Subsidiaries in the consolidated returns that it filed on behalf of its affiliated group for the taxable years ended December 31, 2012 and 2013. Instead, each Loss Subsidiary filed a separate return for each of those years claiming deductions for accrued interest on the Deficiency Notes.

The 2013 return filed by each Loss Subsidiary included as an attachment pages from a "Detail General Ledger" that, in regard to accrued interest and principal on the Deficiency Notes, include entries dated May 1, 2013, with the transaction description "W/O." Each of those returns also includes Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment). Each Form 982 reports amounts on line 2, "[t]otal amount of discharged indebtedness excluded from gross income," and line 6, "amount excluded from gross income . . . [a]pplied to reduce any net operating loss that occurred in the tax year of the discharge or carried over to the tax year of the discharge." In each case, the amount shown on line 2 matches the amount shown on line 6, indicating that all of the discharged debt excluded from gross income was applied to reduce net operating losses.

**[\*7]**                             *Discussion*

I.      *Applicable Law*

    A.      *Summary Adjudication*

Summary judgment expedites litigation.  It is intended to avoid unnecessary and expensive trials.  It is not, however, a substitute for trial and should not be used to resolve genuine disputes over issues of material fact.  *E.g.*, *RERI Holdings I, LLC v. Commissioner*, 143 T.C. 41, 46–47 (2014).  The moving party has the burden of showing the absence of a genuine dispute as to any material fact.  *Id.*  For these purposes, we afford the party opposing the motion the benefit of all reasonable doubt, and we view the material submitted by both sides in the light most favorable to the opposing party.  That is, we resolve all doubts as to the existence of an issue of material fact against the movant.  *E.g.*, *Estate of Sommers v. Commissioner*, 149 T.C. 209, 215 (2017).

    B.      *Cancellation of Indebtedness*

Section 61(a) defines gross income to mean "all income from whatever source derived."  That section goes on to list items specifically included in gross income, including "[i]ncome from discharge of indebtedness."  § 61(a)(12).  Section 108(a)(1)(B), however, excludes from a taxpayer's gross income amounts otherwise includible as a result of the discharge of indebtedness if "the discharge occurs when the taxpayer is insolvent."  The section 108(a)(1)(B) exclusion is limited to "the amount by which the taxpayer is insolvent."  *See* § 108(a)(3).

The exclusion of cancellation of indebtedness income from a taxpayer's gross income under the insolvency exception is not always permanent.  As a concomitant of the exclusion, the taxpayer must apply the excluded income to reduce specified tax attributes, such as net operating losses and business credits, to the extent provided in sections 108(b) and 1017.  The reduction of tax attributes may require the taxpayer to recognize additional taxable income in the future.  To that extent, the insolvency exception effects merely a deferral of tax rather than a permanent exemption.

A debt is treated as discharged "as soon as it becomes clear, on the basis of a practical assessment of all the facts and circumstances, that it will never have to be repaid."  *Miller v. Commissioner*, T.C. Memo. 2006-125, 2006 WL 1652681, at \*16.  Identifying the time of discharge "is essentially a question of fact."  *Carl T. Miller Tr. v. Commissioner*, 76

**[\*8]** T.C. 191, 195 (1981). In making that determination, "State statutes limiting the time within which a creditor may bring an action against a debtor to recover a debt, while of evidentiary value, are not necessarily controlling." *Id.* Thus, cancellation of a debt for tax purposes may occur either before or after the expiration of any applicable period of limitations.

Section 16.004(a) of the Texas Civil Practice and Remedies Code provides: "A person must bring suit on [specified] actions not later than four years after the day the cause of actions accrues." Actions on "debt" are among those subject to section 16.004(a). Tex. Civ. Prac. & Rem. Code § 16.004(a)(3) (2013). Texas Civil Practice and Remedies Code § 16.065 (2013) provides:

> An acknowledgment of the justness of a claim that appears to be barred by limitations is not admissible in evidence to defeat the law of limitations if made after the time the claim is due unless the acknowledgment is in writing and is signed by the party to be charged.

Section 3.118(a) of the Texas Business & Commerce Code provides as a general rule that "an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note." Chapter 3 of Title I of the Business and Commerce Code "applies to negotiable instruments." Tex. Bus. & Com. Code § 3.102(a). A promise or order to pay money is not a negotiable instrument unless it is unconditional. *Id.* § 3.104(a). Texas Business and Commerce Code § 3.106(a) (2013) provides, subject to specified exceptions, that, "for the purposes of Section 3.104(a), a promise or order is unconditional unless it states (i) an express condition to payment, (ii) that the promise or order is subject to or governed by another record, or (iii) that rights or obligations with respect to the promise or order are stated in another record."

C.     *Investment Basis Adjustments and Excess Loss Accounts*

Section 1501 allows affiliated corporations to join together to file a single consolidated return. The mechanics of doing so are spelled out in regulations promulgated under section 1502.

Although the consolidated return regulations endeavor, to the extent possible, to treat the members of a consolidated group as a single corporation, they often bow to the reality of the members' separate existence. For example, the regulations recognize the ownership by one

**[*9]** member of a group of stock of another member. In fealty to the single-entity principle, however, Treasury Regulation § 1.1502-32 requires the parent member (*M*) to adjust its basis in the stock of the subsidiary member (*S*) to reflect the subsidiary's income, gain, loss, and deductions. Negative adjustments that exceed *M*'s basis in the *S* stock create an "excess loss account" (ELA) that "is treated for all Federal income tax purposes as basis that is a negative amount." Treas. Reg. § 1.1502-19(a)(2)(ii). Consequently, an ELA will increase the gain *M* recognizes upon its disposition of *S* stock.

*M*, the parent member, must also recognize gain from an ELA upon one of several events that cause it to be "treated as disposing of" its *S* stock. Treas. Reg. § 1.1502-19(c)(1). Treasury Regulation § 1.1502-19(c)(1)(iii) lists three different events under the caption "Worthlessness." Subdivision (c)(1)(iii)(A), as amended in 2008, applies when "[a]ll of S's assets (other than its corporate charter and those assets, if any, necessary to satisfy state law minimum capital requirements to maintain corporate existence) are treated as disposed of, abandoned, or destroyed for Federal income tax purposes." If *S* owns stock in a lower tier member, it is treated as having disposed of that stock when the lower tier member disposes of its assets. Treas. Reg. § 1.1502-19(c)(1)(iii)(A). Subdivision (c)(1)(iii)(B) applies when "[a]n indebtedness of S is discharged, if any part of the amount discharged is not included in gross income and is not treated as tax-exempt income under § 1.1502-32(b)(3)(ii)(C)."[4] Subdivision (c)(1)(iii)(C) applies when

> [a] member takes into account a deduction or loss for the uncollectibility of an indebtedness of S, and the deduction or loss is not matched in the same tax year by S's taking into account a corresponding amount of income or gain from the indebtedness in determining consolidated taxable income.

As a general rule, upon an actual or constructive disposition of *S* stock, its parent, *M*, must recognize the entire amount of any ELA in respect of that stock. The recognition of ELAs may be limited, however, when the deemed disposition event is the cancellation of *S*'s indebtedness. Treasury Regulation § 1.1502-19(b)(1)(ii) provides:

---

[4] Treasury Regulation § 1.1502-32(b)(3)(ii)(C)(*1*) provides: "Excluded COD income is treated as tax-exempt income only to the extent the discharge is applied to reduce tax attributes attributable to any member of the group . . . ."

**[\*10]**  [I]f M is treated as disposing of a share of S's stock as a result of the application of paragraph (c)(1)(iii)(B) of this section, the aggregate amount of its excess loss account in the shares of S's stock that M takes into account as income or gain from the disposition shall not exceed the amount of S's indebtedness that is discharged that is neither included in gross income nor treated as tax-exempt income under § 1.1502-32(b)(3)(ii)(C)(*1*).

Before amendments to Treasury Regulation § 1.1502-19 adopted in 2008, the asset disposition rule provided in subdivision (c)(1)(iii)(A) applied when the subsidiary disposed of substantially all of its assets. The preamble to the proposed amendments explained the change to the asset disposition rule as follows:

> Section 1.1502-19(c)(1)(iii) defines the term "worthless" for purposes of excess loss account recapture (resulting in the inclusion of the excess loss account in income).  The definition of worthlessness in § 1.1502-19(c)(1)(iii) is adopted for determining the time when subsidiary stock with positive basis may be treated as worthless (and therefore deductible).  See § 1.1502-80(c).[5]

> Section 1.1502-19(c)(1)(iii)(A) generally provides that a share of subsidiary stock will be treated as worthless when substantially all the subsidiary's assets are treated as disposed of, abandoned, or destroyed for federal tax purposes.  This provision prevents an excess loss account from being included in income (and a worthless stock deduction from being taken) until the subsidiary's activities have been taken into account by the group.  As a result, the group's income is clearly reflected and single entity treatment is promoted.

> The current regulations do not, however, define the term "substantially all" for purposes of § 1.1502-19(c)(1)(iii)(A).  Particular concerns have arisen because the term is used in many other areas of tax law, most notably in the area of corporate reorganizations.  Because

---

5 Treasury Regulation § 1.1502-80(c)(1) provides:  "Subsidiary stock is not treated as worthless under section 165 until immediately before the earlier of the time—(i) The stock is worthless within the meaning of § 1.1502-19(c)(1)(iii); or (ii) The subsidiary for any reason ceases to be a member of the group."

**[\*11]** different policies are operative in those areas, the thresholds appropriate in those areas are not necessarily appropriate for purposes of § 1.1502-19(c)(1)(iii)(A) and the consolidated return provisions that incorporate it.

The IRS and Treasury Department believe that the single entity purpose of these consolidated return provisions is best effected by treating a subsidiary's stock as worthless only once the subsidiary has recognized all items of income, gain, deduction, and loss attributable to its assets and operations. Accordingly, these proposed regulations clarify § 1.1502-19(c)(1)(iii)(A) by providing that stock of a subsidiary will be treated as worthless when the subsidiary has disposed of, abandoned, or destroyed (for Federal tax purposes) all its assets other than its corporate charter and those assets, if any, that are necessary to satisfy state law minimum capital requirements to maintain corporate existence.

REG-157711-02 (2007 Preamble), 72 Fed. Reg. 2964, 2985 (Jan. 23, 2007).

D.     *Taxpayers' Duty of Consistency*

Under an equitable doctrine variously referred to as the duty of consistency or quasi-estoppel, this Court and others have imposed on taxpayers a "duty to be consistent with [their] tax treatment of items." *LeFever v. Commissioner*, 103 T.C. 525, 541 (1994), *supplemented by* T.C. Memo. 1995-321, *aff'd*, 100 F.3d 778 (10th Cir. 1996). The doctrine generally prevents taxpayers from benefiting from their own prior errors or omissions. In particular, "[t]he duty of consistency doctrine prevents a taxpayer from taking one position one year and a contrary position in a later year after the limitations period has run on the first year." *Id.* at 541–42.

In *Herrington v. Commissioner*, 854 F.2d 755, 758 (5th Cir. 1988), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986), the Court of Appeals for the Fifth Circuit listed the elements of the duty of consistency as "(1) a representation or report by the taxpayer; (2) on which the Commission[er] has relied; and (3) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner." When those elements are present in a case, "the

**[\*12]** Commissioner may act as if the previous representation, on which he relied, continued to be true, even if it is not." *Id.* The taxpayer is estopped from denying its prior representation.

The duty of consistency does not apply when the erroneous treatment of an item in a prior, closed year reflected a mutual mistake of law on the part of the taxpayer and the Commissioner. *See, e.g., Crosley Corp. v. United States*, 229 F.2d 376 (6th Cir. 1956); *Estate of Posner v. Commissioner*, T.C. Memo. 2004-112, 2004 WL 1045461; *Joplin Bros. Mobile Homes, Inc. v. United States*, 524 F. Supp. 800 (W.D. Mo. 1981).

*Crosley Corp.* involved a corporation's amended return for 1941 that claimed amortization of tooling costs incurred in 1939. For 1939, however, the taxpayer had erroneously deducted the tooling costs. Although the Commissioner audited the taxpayer's 1939 return and made other adjustments, he did not challenge the taxpayer's deduction of the tooling costs. When the taxpayer filed its refund claim, the period of limitation on assessments had run for 1939. In denying the taxpayer's refund, the Commissioner asserted that, under the duty of consistency, the taxpayer was bound by its prior reporting of the costs as expenses in the year incurred. In response, the court wrote:

> The factors necessary to constitute an estoppel are not present in this case. There was no misrepresentation of any fact by the taxpayer. The expenditure involved was actually made. The Commissioner knew that it was for automobile tooling.[6] The Commissioner audited the 1939 return, making material changes. Under the facts which were known to the Commissioner, or were readily available to him, it was a question of law whether the deduction was properly taken in 1939 or should have been treated as a capital expenditure. A mutual mistake of law on the part

---

[6] The opinions of the district court and the appellate court in *Crosley Corp.* do not identify the basis for the latter's conclusion about the Commissioner's knowledge. The district court found as a fact that the taxpayer had deducted "automobile tooling expenses" as a "cost of manufacturing." *Crosley Corp. v. United States*, No. 2652, 1954 U.S. Dist. LEXIS 4741, at \*1 (S.D. Ohio Dec. 17, 1954). The court's findings do not state whether the taxpayer's return described the amount in issue as "automobile tooling expense" or simply included that amount in a larger sum described as "cost of manufacturing." Even if the Commissioner had not actually known that the amount in issue was a tooling expense, that fact was presumably "readily available to him." *Crosley Corp.*, 229 F.2d at 381.

**[*13]** of the taxpayer and the Commissioner in treating it as a cost of manufacturing does not create an estoppel.

*Crosley Corp.*, 229 F.2d at 381 (citations omitted).

The taxpayer in *Joplin Bros.* was a corporation that had succeeded to a partnership and continued the partnership's business of selling mobile homes. Under an arrangement with a local bank, the partnership had received "courtesy payments" in connection with loans the bank made—apparently to the partnership's customers—to finance the purchase of mobile homes. *Joplin Bros. Mobile Homes*, 524 F. Supp. at 804. The partnership did not report the payments as income when received (in 1967 through 1970), intending to include the payments in income only when the contracts for the mobile homes matured. In auditing the corporation's 1972 return, the Commissioner included the courtesy payments in income for that year. The corporation paid the tax and claimed a refund, alleging that the amounts in issue had been income of the partnership when received. The Government asserted the duty of consistency, but the district court held that the doctrine did not apply because the parties had made a mutual mistake of law. The court found that the Internal Revenue Service had learned of the courtesy payments during an audit of the partnership's 1969 return but made no adjustment to include them in the partners' income. *Id.* at 803. The court relied on the testimony of Ken Joplin, who handled the audit. Mr. Joplin testified that he had explained the courtesy payments to the examining agent. The agent testified that he could not remember details of the audit but did not contradict Mr. Joplin's testimony. In addition, the notice of initial disallowance of the taxpayer's refund claim explained the denial on the ground that the prior audit of the partnership had determined that the amounts in issue would be includible in income for 1972—demonstrating that the Commissioner, as well as the taxpayer—had been mistaken about the law. The court also noted that the Commissioner had failed to establish that he had been misinformed about the facts. *Id.*

*Estate of Posner* involved an estate's claim for refund of estate taxes paid on property in a marital trust. The estate of the decedent's husband had claimed a marital deduction for the trust property on the ground that the husband's will gave the decedent a general power of appointment over the property. In its initial estate tax return, the decedent's estate treated the property consistently with the reporting by the husband's estate, including the property in the decedent's gross estate because of a purported general power of appointment. The

[*14] decedent's estate then claimed that litigation in Maryland courts had established that she had *no* power of appointment over the marital trust property and that, consequently, the inclusion of that property in her gross estate had been in error. The Commissioner argued that the duty of consistency precluded the decedent's estate from taking a position contrary to that taken by her husband's estate. We assumed, for the purpose of our opinion, that the two estates had sufficient privity that representations by the husband's estate could bind the decedent's estate. Nonetheless, we found the duty of consistency inapplicable. "[T]he inconsistency arose," we wrote, "because of a mutual mistake in deciding how Mr. Posner's will should be construed under Maryland law—a purely legal issue." *Estate of Posner v. Commissioner*, 2004 WL 1045461, at *9. We added that the Commissioner "had reason to know all the relevant facts." *Id.* Those facts had been disclosed in the estate tax return filed by the husband's estate. The husband's will, which his estate had attached to its return, "disclosed all underlying facts necessary" to answer the legal question of whether that will provided the decedent with a general power of appointment over the marital trust property. *Id.* at *9 n.15. Under the circumstances, we concluded, the Commissioner could not have justifiably relied on the legal representation, made on the estate tax return of the husband's estate, that his will gave his surviving spouse a general power of appointment over the marital trust property.

## II.    *The Parties' Positions*

### A.    *Respondent's Second Amended Answer*

Each of the alternative deficiencies respondent asserts in his Second Amended Answer rests on the inclusion in the income of Edgemont Holdings and OVPI of ELAs in respect of the stock of the Loss Subsidiaries. Respondent has not provided detailed calculations of the ELAs he seeks to include in the shareholders' income. The losses reported by the Loss Subsidiaries since 1989, however, would have required negative adjustments to the bases of their stock. *See* Treas. Reg. § 1.1502-32(b)(2)(i). It is quite plausible that those negative adjustments created ELAs, and petitioner does not dispute that they did. The principal question in the case is whether those ELAs—whatever their precise amounts—had to be included in the shareholders' income for one of the years before us or, instead, for one or more prior years.

[*15] Because each of respondent's theories depend on the duty of consistency, it follows that he accepts that, if Treasury Regulation § 1.1502-19(c)(1) were applied to the actual facts (i.e., without binding petitioner to representations it now denies), the ELAs respondent seeks to include in Edgemont's and OVPI's income for 2012 or 2013 would actually have been includible for 2011 or prior years. Otherwise, respondent would not need to bind petitioner to representations it now denies.

### 1. *Primary Theory*

As noted above, in the primary theory advanced in his second amended answer, respondent seeks to "apply[] the duty of consistency to bind petitioner to . . . representations that May 1, 2013, was the point in time when the Deficiency Notes were discharged." Respondent asserts that the deductions for accrued interest on the Deficiency Notes reported in the returns filed by petitioner's group through 2011 and in the separate returns that the Loss Subsidiaries erroneously filed for 2012 and 2013[7] effectively represented to respondent that the Deficiency Notes remained enforceable until May 1, 2013.[8]

Respondent also claims to have relied on other representations made by the Loss Subsidiaries in their erroneously filed 2013 separate returns. For example, respondent, apparently interpreting "W/O" to mean "written off," interprets the entries with that designation in the Detail General Ledger pages included with each return as "reporting [May 1, 2013] as the date that the statute of limitations expired and discharged the Deficiency Notes." In addition, respondent refers to

---

[7] A corporation is a member of an affiliated group if it is an "includible corporation," within the meaning of section 1504(b), and if one or more other members of the group own at least 80% of the stock of the corporation, measured by both vote and value. *See* § 1504(a)(1) and (2). Each of the Loss Subsidiaries is an indirect, wholly owned subsidiary of petitioner. During a hearing held on March 17, 2021, petitioner's counsel acknowledged that the Loss Subsidiaries remained members of petitioner's group throughout 2012 and 2013.

[8] In his reply to petitioner's Motion for Summary Judgment, respondent concedes that any express or implied representations made on the Loss Subsidiaries' returns for 2012 or 2013—open years that are now before the Court—"are not binding on petitioner under the duty of consistency." Respondent contends that, even so, the Loss Subsidiaries' erroneously filed separate returns "lend support to the implied representation made in 2011 . . . that the debts were not canceled in 2011 and were likely canceled in 2013." Therefore, the Loss Subsidiaries' returns for the open years before us, in respondent's view, "provide supporting evidence confirming petitioner's 1992 through 2011 representations."

**[\*16]** "representations" made on the Forms 982 that "suggest that CODI [cancellation of indebtedness income] on the Deficiency Notes' outstanding balances would be fully realized no earlier than May 1, 2013."

Respondent also claims to have relied on the "Summary of Interest Adjustment and Forgiveness of Debt" schedule he received during the examination of petitioner's 2007 return. In particular, respondent focuses on the statement in that schedule that "Installment[] payments not made are considered COD income after 6 years," which respondent takes to be "an implied representation that CODI on the Deficiency Notes' outstanding balances would not be fully realized before May 1, 2013, six years after their due date—May 1, 2007."

In regard to petitioner's claim that, under Texas law, the period of limitations on enforcement of the Deficiency Notes expired on May 1, 2011, four years after they matured,[9] respondent alleges that the Loss Subsidiaries' continued deduction of accrued interest "represented that they acknowledged the claim [of the holders of the notes] and extended the statute of limitations as allowed by Tex. Civ. Prac. & Rem. Code § 16.605 [sic]."

Deferring the discharge of the Deficiency Notes until 2013, however, would avail respondent nothing if the ELAs he seeks to include in Edgemont Holdings and OVPI's income for that year were triggered into income for an earlier year under the asset disposition rule of Treasury Regulation § 1.1502-19(c)(1)(iii)(A). Respondent needs to establish that the ELAs he wants to include in the shareholders' income for 2013 were not previously recaptured. As respondent acknowledges, the balance sheets included in the 2011 return of petitioner's group list OVPI's only asset as "Investments in Subsidiaries" and show each of the other Loss Subsidiaries as having total assets of zero. Why, then, for purposes of respondent's primary theory, were the ELAs he wants to include in Edgemont Holdings and OVPI's income for 2013 not included in income under the asset disposition rule no later than 2011?

Respondent's answer to that question relies on the statement in the preamble to the 2007 proposed amendments to Treasury Regulation § 1.1502-19(c)(1)(iii)(A) to the effect that "the single entity purpose of

---

[9] In three of its prior Motions for Summary Judgment, petitioner argued that the Deficiency Notes were subject to the four-year statute of limitations provided in section 16.004(a) of the Texas Civil Practice and Remedies Code and thus became unenforceable on May 1, 2011, four years after their maturity date of May 1, 2007.

**[\*17]** these consolidated return provisions is best effected by treating a subsidiary's stock as worthless only once the subsidiary has recognized all items of income, gain, deduction, and loss attributable to its assets and operations." 2007 Preamble, 72 Fed. Reg. at 2985. Respondent reasons that the asset disposition rule, as amended in 2008, must be interpreted so as to best effect the objective of treating the members of a consolidated group as a single entity. Therefore, in respondent's view, a member whose stock has an ELA cannot be treated as having disposed of all of its assets, for purposes of Treasury Regulation § 1.1502-19(c)(1)(iii)(A), until it has "recognized all items of income, gain, deduction, and loss attributable to its assets and operations." 2007 Preamble, 72 Fed. Reg. at 2985. If the Deficiency Notes can be treated as having remained uncanceled until May 1, 2013, it would follow that the Loss Subsidiaries were entitled to deduct accrued interest on those obligations through that date. Consequently, only on May 1, 2013, would the Loss Subsidiaries have taken into account all of the deductions to which they were entitled.

In short, the primary theory advanced in respondent's Second Amended Answer runs as follows: First, the duty of consistency prevents petitioner from denying representations that, if accepted as true, would mean that the Deficiency Notes were not canceled, for federal income tax purposes, until May 1, 2013. Second, the Loss Subsidiaries must therefore be treated as having been entitled to deduct accrued interest through May 1, 2013. Third, not until May 1, 2013, can the Loss Subsidiaries be treated as having recognized all deductions attributable to their assets and operations. Fourth, the Loss Subsidiaries thus cannot be treated as having disposed of all of their assets before May 1, 2013. And fifth, the members of petitioner's group that owned the stock of the Loss Subsidiaries (OVPI and Edgemont Holdings) must be treated under Treasury Regulation § 1.1502-19(c)(1)(iii)(A) as having disposed of that stock during 2013, requiring them to include in their income for that year any ELAs in respect of that stock.[10]

---

[10] If the Deficiency Notes can be treated as having been canceled, and the Loss Subsidiaries treated as having disposed of all of their assets, only in 2013, then both the asset disposition trigger for the recognition of ELAs provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(A) and the cancellation of indebtedness trigger provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(B) would have applied for 2013. The amount of ELAs that a shareholder must include in income as a result of the cancellation of indebtedness trigger, however, is limited by Treasury Regulation

**[\*18]**        2.        *Alternative Theory*

As noted above, the 2012 deficiency that respondent asserts as an alternative position rests on the application of the duty of consistency "to bind petitioner to its representations that the Seven Loss Subsidiaries were not worthless at any time on or before December 31, 2011." In particular, respondent contends that, "from 2006 through 2011, petitioner represented that no share of subsidiary stock became worthless by failing to recapture any ELAs related to the Seven Loss Subsidiaries."

"Worthlessness" is not an operative term in Treasury Regulation § 1.1502-19(c)(1). It appears as the caption of subdivision (c)(1)(iii), which lists three separate events whose occurrence can trigger recognition of an ELA. Consequently, it was not clear which of the three rules provided in Treasury Regulation § 1.1502-19(c)(1)(iii) respondent had in mind when he referred in his second amended answer to alleged representations about when the Loss Subsidiaries became worthless. In his reply to petitioner's Motion for Summary Judgment, however, respondent acknowledged that he "does not dispute the balance sheets included with petitioner's returns" but "maintains that the balance sheets are not determinative of when worthlessness occurs." We take that statement as confirmation that respondent's alternative theory rests on the asset disposition rule provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(A).

B.        *Petitioner's Motion*

In support of its Motion for Summary Judgment, petitioner argues: "Because of [sic] a mistake of law does not trigger the duty of consistency, especially where the relevant facts were equally available to both parties, the duty of consistency is not applicable to this case." Petitioner is not explicit, however, in identifying the mistakes of law it views the parties as having made. It asserts that "[w]hether an instrument is a negotiable instrument is a question of law." But the Deficiency Notes' classification as negotiable instruments would only determine the period of limitation under Texas law on their enforcement. And petitioner recognizes that "[t]he running of the

---

§ 1.1502-19(b)(1)(ii). Because respondent does not address that limitation, we assume that he relies on the application of Treasury Regulation § 1.1502-19(c)(1)(iii)(A) to support the adjustment underlying the deficiency he asserts for 2013.

**[\*19]** statute of limitations applicable to a debt is not necessarily controlling as to when a debt is canceled [for tax purposes]."

Petitioner also challenges respondent's reliance on the preamble to the 2007 proposed amendments to Treasury Regulation § 1.1502-19(c)(1)(iii)(A). It contends that the preamble "is not part of the regulation and does not have the force and effect of law." Petitioner acknowledges that the preamble to a regulation may be consulted to resolve ambiguities in the regulation's text. But Treasury Regulation § 1.1502-19(c)(1)(iii)(A), in petitioner's view, "is not ambiguous." Therefore, petitioner concludes, "reference to the preamble to 'explain' or add additional requirements is both unnecessary and inappropriate."

Petitioner addresses in only cursory fashion respondent's alternative theory. According to petitioner:

> [B]oth parties ignored the legal implications of the "no assets" test contained in the -19 Regulations which required recognition of all accumulated ELA at the point in time when the Seven Loss Subsidiaries had no assets (within the meaning of the -19 Regulations), that is, on December 31, 2011. This was also a mutual mistake of law.

C.    *Respondent's Reply to Petitioner's Motion*

Respondent urges us to deny petitioner's Motion because "both worthlessness and cancellation of indebtedness—which revolve around questions of fact, not law—matters of fact are in dispute." Respondent elaborates that "the factual dispute, in part, involves what petitioner represented to respondent about when it should recognize cancellation of indebtedness income."

Respondent acknowledges that "whether the Deficiency Notes are negotiable instruments may be a legal question under Texas law." Quoting our opinion in *Carl T. Miller Trust*, 76 T.C. at 195, however, respondent reminds us that "[d]etermination of the point in time at which a debtor's obligation has been canceled, giving rise to income, is essentially a question of fact."

Regarding his interpretation of Treasury Regulation § 1.1502-19(c)(1)(iii)(A), respondent implicitly acknowledges that none of the Loss Subsidiaries engaged in operations during 2012 or 2013. He reasons, however, that the deductions for accrued interest that would be allowed to the Loss Subsidiaries through May 1, 2013, if the Deficiency Notes

[*20] were treated as having remained enforceable until that date, would nonetheless be attributable to their operations because they incurred the debt represented by those notes when they still conducted operations.

As respondent points out, the inclusion in a parent's income of negative basis in the stock of a subsidiary (in the form of an ELA) can be viewed as analogous to the allowance of a deduction of any positive basis (in the form of a worthless stock deduction). Consequently, whether the parent's basis in the subsidiary stock is positive or negative, that basis is taken into account, as either income or deduction, upon one of the three "worthlessness" events specified in Treasury Regulation § 1.1502-19(c)(1)(iii). Under the revision of subdivision (c)(1)(iii)(A) proposed in 2007 and adopted in 2008, respondent observes, "subsidiary stock is not treated as worthless until all items associated with the subsidiary's assets and operations have been accounted for." "In other words," respondent posits, "the group will not true up its basis in subsidiary stock (by recognizing either a worthless stock deduction or including ELA in income) until all the subsidiary's activities that can give rise to further basis adjustments have been fully accounted for." That approach, in respondent's estimation, would "promote single entity treatment" and, consequently, "clearly reflect[] the group's income."

As noted above, while respondent accepts the accuracy of the balance sheets included with petitioner's returns, he "maintains that the balance sheets are not determinative of when worthlessness occurs." "The important piece for [his] duty of consistency argument," he explains, "is that petitioner never represented to [him] that any of its subsidiary's [sic] stock became worthless on or before December 31, 2011."

III. *Analysis*

A. *Respondent's Primary Theory*

The primary theory respondent advances in his Second Amended Answer, in support of the deficiency he asserts for 2013, is flawed in two respects. Each of those flaws gives us sufficient reason to grant petitioner's Motion for Summary Judgment in regard to its 2013 taxable year. First, even if we were to accept that, by application of the duty of consistency, the Deficiency Notes should be treated as having been canceled only in May 2013, it would not follow that the asset disposition rule provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(A) did not

**[\*21]** apply until 2013. And second, contrary to respondent's argument, we conclude that the failure to treat the Deficiency Notes as having been canceled before 2012 reflected a mutual mistake of law on the part of petitioner and respondent.

1.  *Interpretation of Treasury Regulation § 1.1502-19(c)(1)(iii)(A)*

Respondent's primary position starts with the proposition that the duty of consistency binds petitioner to representations that, if accepted as true, would mean that the Deficiency Notes were not canceled, for federal income tax purposes, until May 1, 2013—six years after their maturity date. If the Deficiency Notes were not canceled until May 1, 2013, the Loss Subsidiaries would have been entitled to deduct interest on the Deficiency Notes that accrued through that date. On the premise that the Loss Subsidiaries issued the Deficiency Notes before they ceased their operations, respondent reasons that the hypothetical deductions for accrued interest through May 1, 2013, would have been "attributable to" the Loss Subsidiaries' operations. Because the Loss Subsidiaries thus would not have recognized all of their items of deduction attributable to their operations until May 1, 2013, respondent contends, they cannot be treated, for the purpose of Treasury Regulation § 1.1502-19(c)(1)(iii)(A), as having disposed of all of their assets before that date.

Because we reject respondent's argument that the hypothetical deduction of accrued interest through May 1, 2013, would have prevented the application of Treasury Regulation § 1.1502-19(c)(1)(iii)(A) until 2013, we cannot uphold the deficiency respondent asserts for 2013. It is undisputed that none of the Loss Subsidiaries owned any assets at the end of 2012. Therefore, if the prospect of continued deduction of accrued interest on the Deficiency Notes after 2012 did not delay the application of the asset disposition rule provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(A), then the ELAs that respondent seeks to include in the income of the Loss Subsidiaries' shareholders for 2013 would instead have been recognized no later than 2012.[11]

---

[11] If any ELAs in respect of the Loss Subsidiaries' stock that arose before December 31, 2012, had been recognized no later than that date, the deduction of accrued interest for the period from January 1 to May 1, 2013, would have created new ELAs. But the recognition of those ELAs in 2013 would not produce a deficiency. The

[*22] As the 2007 Preamble demonstrates, the asset disposition rule provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(A) had as its stated purpose—both before and after amendment—preventing the recognition of ELAs "until the subsidiary's activities have been taken into account by the group." 2007 Preamble, 72 Fed. Reg. at 2985. According to the drafters of the amendment, recognizing ELAs under the asset disposition rule only when the subsidiary's activities have been taken into account "promote[s]" single entity treatment, and thus the clear recognition of the group's income. *Id.*

The consolidated return regulations, however, do not—indeed, *can*not—treat group members in all respects as a single entity. How much to depart from pure single entity treatment is a matter of judgment. Therefore, it cannot be said that any move in the direction of single entity treatment necessarily results in a clearer reflection of income.

As noted above, recognizing one group member's ownership of stock of a subsidiary departs from single entity treatment. If the members of the group were treated as a single entity, a parent's ownership of stock of a subsidiary would be disregarded. The parent would have no basis—positive or negative—in the subsidiary's stock.

Requiring the recognition of negative basis, in the form of an ELA, upon the subsidiary's disposition of a specified quantum of its assets effects a *further* departure from single entity treatment. If the parent and subsidiary were a single corporation, that corporation's disposition of all of the assets of an unprofitable business funded with borrowings that remain outstanding would not provide an occasion to call the single corporation to account for the tax benefit it received from deductions paid for with the lender's money. Instead, that "true up" would occur only when the debt came due, at which time the prior deductions would either be paid for by repayment of the debt or offset by cancellation of indebtedness income.

In short, the mere existence of the asset disposition rule provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(A) departs from the single entity paradigm. For that reason, however, heightening the threshold for the rule's application (that is, increasing the quantum of assets that must be disposed of to trigger the rule) would move toward single entity

---

income from the recognition of the newly created ELAs would simply have offset the interest deductions.

[*23] treatment. Requiring the recognition of ELAs under the asset disposition rule only when the group has taken into account all of the subsidiary's activities would, at least by the single entity metric, be preferable to triggering ELAs when the subsidiary remained active (and might earn sufficient income to eliminate the ELA in its stock).

As the drafters of the current version of the asset disposition rule recognized, the old "substantially all" rule did not effectively identify when a subsidiary's activities had been taken into account by the group. The prior rule did not define "substantially all." Under some definitions of that term, a subsidiary could have disposed of substantially all of its assets and been left with more than enough assets to continue meaningful (and potentially profitable) operations.

The 2008 amendment to Treasury Regulation § 1.1502-19(c)(1)(iii)(A) thus increased the required quantum of assets whose disposition would trigger the application of the rule and the consequent recognition of ELAs. Therefore, the revised rule more accurately identifies the time at which a group has taken into account all the activities of a subsidiary member whose stock had an ELA.

The 2007 preamble reflects the drafters' assumption that, once a subsidiary has disposed of all of its assets other than those necessary to maintain corporate existence, it will have recognized "all items of income, gain, deduction, and loss attributable to its assets and operations." 2007 Preamble, 72 Fed. Reg. at 2985. That assumption would be almost universally valid. A subsidiary generally could not engage in meaningful operations when its only remaining assets are a corporate charter and whatever minimal capital is required to meet state law requirements. Even if, beyond that point, the subsidiary recognizes some items of income, gain, deduction, or loss (such as income earned from the investment of its minimum capital), those items would seldom, if ever, be attributable to the subsidiary's operations.

Respondent's argument poses the question of how Treasury Regulation § 1.1502-19(c)(1)(iii)(A) should be applied in a circumstance in which the assumption of the drafters of the 2008 amendment proves to be invalid. What if, after a subsidiary disposes of all of its assets other than the minimum necessary to maintain corporate existence, it recognizes one or more items of income, gain, deduction, or loss that can be viewed as, in some sense, attributable to its assets and operations?

[*24] The present case does not require us to answer that question because we are not convinced that it presents that circumstance—that is, we are not convinced that the deductions for accrued interest on the Deficiency Notes that would have been allowed through May 1, 2013, had the Deficiency Notes not been canceled until that date would have been "attributable to" both the Loss Subsidiaries' assets and their operations. Respondent suggests that those hypothetical deductions should be viewed as attributable to the operations he alleges the Loss Subsidiaries to have been conducting when they issued the Deficiency Notes. But respondent does not explain how those hypothetical deductions would be attributable to assets the Loss Subsidiaries no longer owned. Moreover, respondent's "relation back" analysis would raise subjective questions of the type that the drafters of the 2008 amendments apparently sought to avoid with the adoption of a bright-line rule.

Therefore, even if we were to accept the premise that, under the duty of consistency, petitioner is bound by representations that, if accepted as true, would mean that the Deficiency Notes were not canceled until May 1, 2013, we would nonetheless conclude that the asset disposition rule provided in Treasury Regulation § 1.1502-19(c)(1)(iii)(A) applied no later than 2012. We thus cannot uphold the 2013 deficiency asserted in respondent's Second Amended Answer.

### 2. *Duty of Consistency*

We begin our consideration of respondent's assertion that petitioner is bound to "representations that May 1, 2013, was the point in time when the Deficiency Notes were discharged" by addressing the admissibility of the schedule captioned "Summary of Interest Adjustment and Forgiveness of Debt." Although the parties submitted that document on December 19, 2019, as Exhibit 73–J to the Stipulation of Facts they filed on November 25, 2019, the Stipulation makes no mention of the Exhibit. On December 10, 2019, petitioner submitted a Motion in Limine and an accompanying Memorandum asking that we exclude from evidence specified documents that respondent sought to introduce. Petitioner's Motion in Limine, having been filed before the submission of Exhibit 73–J, does not address that Exhibit. In its response to respondent's Second Amended Answer, which refers to

[*25] Exhibit 73–J, petitioner purported to object to Exhibit 73–J "for the reasons stated in [its] Motion *in Limine.*"

Whatever the merits of the arguments petitioner advanced in regard to the documents covered by its Motion in Limine, those arguments do not give us reason to disregard Exhibit 73–J in disposing of petitioner's Motion for Summary Judgment. In the Memorandum it submitted in support of its Motion in Limine, petitioner included the following "Summary of Argument":

> The [disputed] Documents contain multiple references to a supposed "agreement" between respondent and counsel for the petitioner's counsel [sic] that was entered into in the process of settling a previous case for petitioner, involving earlier years but issues that are the same or very similar to the issues at bar in the instant case. References in respondent's Documents to an "agreement" and its contents are a classic example of objectionable hearsay, i.e., a statement made out of court, (i.e., the "agreement") offered in evidence to prove the truth of the matters asserted therein. Written references in the Documents to the "agreement" or its contents also violate [Federal] Rule [of Evidence] 408's prohibition against admissibility of "conduct or a statement made during compromise negotiations". Curing the hearsay problems by offering oral testimony from the persons involved in the supposed "agreement" is not possible because any oral testimony regarding the agreement would likewise run afoul of Rule 408(a)(2), F. R. Ev.

Exhibit 73–J makes no reference to any agreement between the Commissioner and petitioner. Again, in respondent's description, the Exhibit is a schedule provided to the Commissioner in response to an information document request during an examination of the 2007 return of petitioner's group. Petitioner does not challenge respondent's description. We would not expect the parties, during the information-gathering stage of an examination, to be negotiating the possible settlement of issues. Therefore, the absence of any reference to a settlement agreement in Exhibit 73–J is not surprising. Moreover, respondent, as we understand him, does not seek to rely on Exhibit 73–J to establish the truth of the proposition that the Loss Subsidiaries' obligations to make specified payments under the terms of the Deficiency Notes were canceled, for federal tax purposes, precisely six

**[\*26]** years after each payment's due date. Both parties now accept that that proposition is incorrect. Respondent relies on Exhibit 73–J only to establish that petitioner *represented* that the payments due would be canceled in six years. The relevant point is not that what petitioner said was true but simply that petitioner said it. That is not hearsay. *See* Fed. R. Evid. 801(c) (defining "hearsay" as an out-of-court statement offered "to prove the truth of the matter asserted in the statement").

We will therefore consider Exhibit 73–J in evaluating respondent's primary duty of consistency argument. As explained below, we find that the exhibit whose admissibility petitioner challenges actually supports its claim that its inconsistent positions reflect a mutual mistake of law between it and respondent.

To review, in his primary theory, respondent seeks to bind petitioner to representations that the Deficiency Notes would be canceled on May 1, 2013. In its Motion for Summary Judgment, petitioner relies on the proposition that its erroneous treatment of the Deficiency Notes reflected a mutual mistake of law but does not precisely identify the nature of that mistake. And respondent counters that the question of when debt is canceled for tax purposes is essentially one of fact.

Respondent's own argument demonstrates that he, like petitioner, had been operating under a mistaken view of the law. Respondent purports to have relied on representations by petitioner that obligations on the Deficiency Notes would be canceled for tax purposes on specified future dates. He gives as an example of such a representation the statement in Exhibit 73–J that "Installment[] payments [on the Deficiency Notes] not made are considered COD income after 6 years." As respondent now recognizes, however, under the applicable test, a debt is treated as discharged for tax purposes when circumstances demonstrate the practical reality that the debt will not be repaid. *See Miller v. Commissioner*, 2006 WL 1652681, at \*16. The arrival of that point cannot be predicted years in advance.[12] The

---

[12] Nothing on Exhibit 73–J indicates when the document was created. But, as noted in the text, the document states (and applies) a rule that payments required under the Deficiency Notes would, if unpaid, be treated as canceled for tax purposes six years after their due date. Applying that rule, a table showing potential forgiveness of debt income through 2013 could have been created upon the issuance of the debt. At any time—potentially years or even decades in advance—one could have predicted the cancellation of each unpaid amount by knowing only its due date. And the due date of each payment was set when the Deficiency Notes were issued.

[*27] representations on which respondent acknowledges reliance are premised on the erroneous view that a state statute limiting the period during which a debt can be enforced determines when the debt is treated as canceled for tax purposes. Petitioner, in making those representations, betrayed a legal mistake. And respondent, in acknowledging his reliance on those representations, admits that he shared petitioner's erroneous view of the law. If respondent had understood the relevant law when petitioner made the representations to which respondent now seeks to bind petitioner, he would not have relied on them.

Respondent has not identified any fact relevant to the cancellation of the Deficiency Notes that he neither knew nor had reason to know when petitioner's 2011 taxable year remained open. Respondent alludes to the prospect that "the Seven Loss Subsidiaries [might have] acknowledged the debt in 2011, rendering the debt valid." But respondent's failure to have required petitioner's group to take into account for 2011 the full cancellation of the Deficiency Notes cannot be attributed to a supposition that the Loss Subsidiaries acknowledged their debt by signed writings executed in 2011. Respondent professes to have relied on petitioner's representations that each payment due under the Deficiency Notes would not be canceled until six years after its due date. Respondent's professed reliance indicates that, while 2011 remained open, he was of the view that (1) enforcement of the notes under Texas law was subject to a six-year statute of limitation and, moreover, (2) that state statute governed when the notes would be canceled for federal income tax purposes. Under that view, a signed written acknowledgement of the Deficiency Notes executed between May 2 and December 31, 2011, would have waived the statute of limitations only for the payment that became due on May 1, 2005.[13]

Respondent contends that the facts of the present case "are similar to" those in *Hollen v. Commissioner*, T.C. Memo. 2000-99, 2000 WL 303128, *aff'd*, 25 F. App'x 484 (8th Cir. 2002). *Hollen* involved a sale of ranch property in October 1988 by a partnership of which the taxpayer-husband was a partner. In computing its gain from the sale,

---

[13] Respondent suggests that "[p]etitioner's failure to report the CODI in 2011 may be an implied statement of the facts relating to a written acknowledgment to extend the statute, which, under the duty of consistency, petitioner cannot now repudiate." But respondent cannot simultaneously bind petitioner to representations that (1) the Deficiency Notes would not be canceled until six years after their maturity date of May 1, 2007, and (2) the Loss Subsidiaries executed written acknowledgements to waive the Texas statute of limitations when it expired in 2011.

[*28] the partnership reduced its basis in the property by the depreciation it had previously claimed and allocated one-third of the resulting gain to the husband. The taxpayers did not report the husband's share of the partnership gain on their 1988 individual tax return. Instead, that return reported that, in August 1988, the husband had sold his interest in the partnership to his professional corporation. The professional corporation, however, did not report on its 1988 corporate tax return any share of the partnership's gain from the sale of the ranch property. The Commissioner disregarded the purported transfer of the husband's partnership interest and alleged that the taxpayers were required to include in their income the husband's share of the partnership's gain.

Among other things, the taxpayers argued that they and four other individuals had actually owned the ranch property in prior years. They claimed that *their* bases in the property were not reduced by depreciation erroneously claimed by the partnership.

In response to the taxpayers' argument, the Commissioner invoked the duty of consistency, which, he contended, bound the partnership and the taxpayers "to their original reporting position—that the ranch was partnership property." *Id.* at *3. We agreed.

The taxpayers apparently contended that the case required us to resolve the state law question of the property's ownership. We rejected that argument. "Determining whether the ranch was owned by the partners as individuals or by the partnership," we wrote, "is simply not necessary to our decision regarding the duty of consistency." *Id.* at *5. We continued: "[O]nce we determine that the duty of consistency applies, we no longer care who actually owned the ranch since, for Federal income tax purposes, the duty of consistency requires petitioners to be bound by their prior representations regarding the ranch's ownership." *Id.* We thus declined to "decide who actually owned the ranch or whether State law applies in deciding that issue." *Id.*

Respondent reads *Hollen* to say that the representations about the ownership of the ranch property were factual rather than legal. He reasons that, in *Hollen*, we "effectively refus[ed] to look through the factual representation to find a legal representation." "[B]ecause the taxpayers had made a factual representation," respondent explains, "the taxpayers were bound to that representation—even if it was based on an erroneous application of state law." Respondent sees the present

**[*29]** case as similar to *Hollen* in that petitioner here "made factual representations about when it would recognize the CODI."

Petitioner's representations "about when it would recognize" cancellation of indebtedness income were not "factual." Petitioner was in no position to predict years in advance when the Deficiency Notes would be canceled for federal income tax purposes. Such a prediction would require foreknowledge of future facts. Petitioner's statements that the Loss Subsidiaries' obligations to make specified payments would be canceled six years after their due date reflected a misunderstanding of the legal test for when indebtedness is canceled for tax purposes. And respondent's reliance on those representations demonstrates that he shared petitioner's mistaken view of the applicable tax law standard.[14]

Respondent lists *Orange Securities Corp. v. Commissioner*, 131 F.2d 662 (5th Cir. 1942), *aff'g* 45 B.T.A. 24 (1941), as another case that "involve[d] a similar fact pattern." We disagree. The erroneous reporting at issue in *Orange Securities* did not reflect a mutual mistake in law. That reporting (more precisely, a failure to report) concerned a sale of real property in 1926 by an individual named Giles. In exchange for the property, Mr. Giles received notes with a face amount of $98,700. Mr. Giles's basis in the property was determined by its $5,720 value on March 1, 1913. Mr. Giles reported no gain on his 1926 return. According to the findings of our processor, the Board of Tax Appeals: "During the year 1927 an internal revenue agent, through an examination of real estate records, became familiar with the conveyance of the . . . property . . . but did not alter the income of Giles or make formal report of his discovery." *Orange Sec.*, 45 B.T.A. at 25. In 1930, in a tax-free

---

[14] Moreover, although we gave significant attention to respondent's duty of consistency argument in *Hollen*, acceptance of that argument may have been unnecessary to the result in that case. The taxpayer-husband in *Hollen*

> assume[d] that if he [could] convince us that the ranch was not partnership property, he [could] calculate the gain from the sale of the ranch in 1988 using his cost basis unreduced by depreciation because, in his capacity as the owner of the ranch, he never claimed depreciation on the ranch.

*Hollen v. Commissioner*, 2000 WL 303128, at *3 n.7. As we explained, however, "[s]ec. 1016(a)(2) requires that a taxpayer's basis in property must be reduced by depreciation *allowed or allowable*." *Id.* "Even if [the husband had] not claim[ed] depreciation with respect to the ranch," we concluded, his basis in the ranch would still have been "reduced by the depreciation allowable under sec. 167 if the requirements of sec. 167 [were] met." *Id.*

**[\*30]** incorporation, Mr. Giles transferred to the taxpayer corporation the notes he had received in exchange for the real property four years earlier. In 1936, the taxpayer received $80,000 in settlement of the liability the notes represented. The taxpayer claimed that it had a tax basis in the notes of $98,700 because their fair market value when Mr. Giles received them had equaled their face amount. The Commissioner contended that the taxpayer's basis in the notes was only $5,720. The Board applied the duty of consistency to hold for the Commissioner:

> The petitioner's transferor, Giles, in 1926, by his failure to report gain on the sale of the land, in effect declared that the notes had no fair market value at that time. This was a determination of fact which he was in a position to make accurately. Responsibility for the error, if indeed there was error, may not be shifted to the Commissioner by a showing that an agent became casually aware of the sale and accepted Giles' treatment of the notes as having no fair market value.

*Id.* at 28.

The taxpayer argued that the duty of consistency did not apply because Mr. Giles's failure to report gain in 1926 reflected a mistake of law—in particular, his erroneous view that the transaction had been eligible for installment sale treatment. In the Board's evaluation, however, the weight of the evidence showed "that Giles considered the notes as having no fair market value in 1926 and for that reason failed to report the transaction." *Id.* at 29.

Although the Court of Appeals for the Fifth Circuit affirmed the Board's holding, it viewed as an open but irrelevant question whether Mr. Giles's mistake was one of fact or law. The appellate court understood the Board to have made "no precise finding," although it acknowledged that the Board had, in the Fifth Circuit's view, "assumed" that Mr. Giles "thought the notes had no value." *Orange Sec. Corp. v. Commissioner*, 131 F.2d at 663. By contrast, the appellate court wrote:

> We do not think it matters what influenced [Mr. Giles] to return no gain in 1926. The important fact is that he intentionally elected not to do it and the revenue agent who learned the facts in 1927 must have acquiesced. We do not think it would matter whether there was a mistake of law or fact, or both.

**[\*31]** *Id.*

Respondent views *Orange Securities* as having involved "a factual or mixed question about basis and potentially underlying legal questions." He claims that "[t]he Fifth Circuit, in effect, did not look into underlying legal questions that could affect a factual representation and instead required that the taxpayer be bound to its representation about cost basis in a closed year."

We acknowledge that the Fifth Circuit in *Orange Securities*, *id.*, appeared equally willing to apply the duty of consistency whether the error in prior reporting had involved "a mistake of law or fact, or both." But we do not accept the Fifth Circuit's opinion in that case as authority for the proposition that the duty of consistency can apply to cases, such as the one before us, that involve mutual mistakes of law. To the extent that the court suggested that it *would have* applied the duty of consistency even if—contrary to the Board's evaluation of the evidence before it—the case had involved a mutual mistake of law, that suggestion is not only dicta but is contrary to the subsequent precedents in this Court and the Fifth Circuit that recognize an exception to the duty of consistency for cases involving mutual mistakes of law. *See, e.g.*, *Herrington v. Commissioner*, 854 F.2d at 758; *Estate of Posner v. Commissioner*, 2004 WL 1045461, at \*8.

In our view, cases such as *Estate of Posner* and *Joplin Brothers* are more on point than *Hollen* or *Orange Securities*. Respondent acknowledges *Estate of Posner* but attempts to distinguish it as follows:

> In *Estate of Posner* . . . the Court did not apply the duty of consistency because the taxpayer and IRS had made a mutual mistake of law when deciding how to construe a will under Maryland law. . . . In *Estate of Posner* the taxpayer did not misrepresent the property or type of property that the will transferred. . . . In contrast here, petitioner mispresented when the Seven Loss Subsidiaries were worthless and when petitioner fully recognized CODI. Both are questions that this Court and the Fifth Circuit have found to be ones of fact—not law.

We agree, of course, that the question of when a debt is discharged for tax purposes is essentially a factual question. *Carl T. Miller Tr.*, 76 T.C. at 195. Failing to recognize that the essentially factual test described in *Carl T. Miller Trust* is the governing test, however, betrays

[*32] a mistake of law—one shared by the parties before us. Petitioner's representations demonstrate its legal error. And respondent's admitted reliance on those representations shows that it joined petitioner in that legal error.

Respondent observes that, "[i]n *Joplin Brothers*, the taxpayer fully disclosed courtesy payment amounts to a revenue agent when the taxpayer received those amounts." By contrast, in the present case, petitioner did not disclose, "while 2011 remained open . . . that it received the purported 2011 economic benefit, namely that the full amount of its debt had been canceled in 2011." Petitioner acknowledges that it failed to report for 2011 the cancellation of remaining payments due under the Deficiency Notes because of an erroneous view of the relevant tax law. And, again, respondent's professed reliance on petitioner's representations shows that he shared that erroneous legal view.

For the reasons explained above, we conclude that the duty of consistency does not bind petitioner to representations concerning when the Deficiency Notes were canceled for federal income tax purposes. Respondent's argument for the existence of a deficiency for 2013 rests on the proposition that petitioner is so bound. Because we reject that argument, it follows that no deficiency exists in the federal income tax of petitioner's group for the taxable year ended December 31, 2013.

### B. *Respondent's Alternative Theory*

While we accept that petitioner's erroneous reporting in regard to the cancellation of the Deficiency Notes reflected a mistake of law made by petitioner and respondent alike, petitioner has not demonstrated that the same is true in regard to its failure to apply the asset disposition rule of Treasury Regulation § 1.1502-19(c)(1)(iii)(A) for 2011 or earlier years. As noted *supra* Part II.B, petitioner simply asserts that "both parties ignored" the applicable regulation. An error in prior reporting does not, by itself, establish a mistake of law on the taxpayer's part, nor does the Commissioner's failure to correct that error demonstrate that the Commissioner shared any erroneous view of the law the taxpayer may have held.

In both *Crosley Corp.* and *Joplin Brothers*, the examinations that considered and left unchanged the taxpayers' erroneous reporting indicated that the Commissioner joined in the taxpayer's mistake of law. In *Estate of Posner v. Commissioner*, 2004 WL 1045461, at *9, we

[*33] reasoned that, regardless of whether the Commissioner actually knew all of the relevant facts concerning the decedent's power over the marital trust property, he "had reason to know" those facts because the estate tax return filed by the estate of the decedent's husband had attached a copy of his will.

Petitioner might have argued that the balance sheets for the Loss Subsidiaries included with its returns for 2011 and prior years disclosed to respondent all relevant facts regarding the application of Treasury Regulation § 1.1502-19(c)(1)(iii)(A). Respondent argues that "the balance sheets are not determinative of when worthlessness occurs." Respondent's argument presumably reflects his view that a subsidiary cannot be treated as having disposed of all of its assets, for purposes of Treasury Regulation § 1.1502-19(c)(1)(iii)(A), until it has "recognized all items of income, gain, deduction, and loss attributable to its assets and operations." 2007 Preamble, 72 Fed. Reg. at 2985. But respondent may also be alluding to the prospect that a corporation may hold assets not required to be shown on its balance sheet. We view as unlikely, and even implausible, that each Loss Subsidiary held sufficient assets not required to be shown on its balance sheet to avoid the application of Treasury Regulation § 1.1502-19(c)(1)(iii)(A) before January 1, 2012. Nonetheless, that prospect is at least theoretically possible.

However we might have resolved the debate suggested above, it has not been joined. Did petitioner's returns for 2011 and prior years give respondent reason to know all of the relevant facts concerning the application of Treasury Regulation § 1.1502-19(c)(1)(iii)(A)? Was respondent entitled to rely on an implied representation, however implausible, that each Loss Subsidiary held through the end of 2011, sufficient assets not required to be shown on its balance sheet to avoid the application of the asset disposition rule? Petitioner has not acknowledged those questions, much less addressed them adequately. Petitioner's bare assertion that "both parties ignored the legal implications of" Treasury Regulation § 1.1502-19(c)(1)(iii)(A) is insufficient to demonstrate its entitlement to judgment as a matter of law that no deficiency exists for its taxable year ended December 31, 2012.

IV.    *Conclusion*

We will thus grant petitioner's Motion for Summary Judgment in part and deny it in part. In particular, we will grant so much of petitioner's Motion as requests rulings that (1) the duty of consistency

**[*34]** does not bind petitioner to representations that, if accepted as true, would mean that the Deficiency Notes were canceled after December 31, 2011, and (2) no deficiency exists in the federal income tax of petitioner's group for the taxable year ended December 31, 2013. Further proceedings will be necessary to determine the existence of a deficiency for the taxable year ended December 31, 2012. We note, however, that, for respondent to prevail on his alternative theory, he will need to establish that any ELAs he seeks to include in the income of Edgemont Holdings and OVPI for 2012 were not required to have been included in income for 2011 or earlier years by reason of the cancellation of the Deficiency Notes.

*An appropriate order will be issued.*